QUINCY CABLESYSTEMS, INC., and
New England Sports Network,
Plaintiff,

v.

SULLY'S BAR, INC., d/b/a Sully's Bar,
Darcy's Village Pub, Inc., d/b/a Darcy's Village, Cafe Pub, Cafe Viking,
Inc. of Quincy, d/b/a Dee Dee's Restaurant, and C.M. Kane Corp., d/b/a
Kane's Place, Defendants.

Civ. A. No. 86–2183–C.

United States District Court,
D. Massachusetts.

May 2, 1988.

Philip X. Murray, Boston, Mass., for plaintiff.

Carol S. Ball, Frank W. Kilburn & Associates, Boston, Mass., for Cafe Viking, Inc.

Arnold S. Solod, Solod and Rovner, P.A., Boston, Mass., for C.M. Kane Corp.

Nancy Gertner, Gail S. Strassfeld, Silverglate, Gertner, Baker, Fine, Good & Mizner, Boston, Mass., for Sully's Bar & Darcy's Pub.

## MEMORANDUM

CAFFREY, Senior District Judge.

This action was brought by the plaintiffs, Quincy Cablesystems ("Quincy Cable") and New England Sports Network ("NESN") for violation of the Federal Communications Act, 47 U.S.C. § 605, and of M.G.L. c. 93A. The plaintiffs now move for partial summary judgment on the issue of the defendants' liability under these statutes.

## I. BACKGROUND

The relevant facts are not in dispute. The plaintiff Quincy Cable owns and operates a cable television system in Quincy, Massachusetts. Quincy Cable has contracted with plaintiff NESN to receive NESN's programs, which are then transmitted to Quincy Cable's subscribers. NESN transmits its programs to Quincy via an unencrypted satellite signal.[1] Neither Quincy Cable nor NESN intended NESN's satellite signal be used by anyone other than paying subscribers.

The defendants are three taverns located in Quincy, Massachusetts. Each defendant owns and has operated a satellite dish antenna (a "dish"), by which it picks up video signals from satellites. The programs received by the defendants are then shown to the defendants' patrons. One of the satellite signals received by the defendants was the signal transmitted by NESN to Quincy Cable. The plaintiffs claim that the defendants' interception and use of the NESN signal violates the Federal Communications Act, 47 U.S.C. § 605, and M.G.L. c. 93A.

---

1. Some broadcasters encrypt their signals, that is, they encode them so that special equipment is required to decode them for use on ordinary televisions.

## II. DISCUSSION

### A. *The Federal Communications Act*

■ The relevant part of the Federal Communications Act ("FCA") provides:

No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication ... for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents ... of such communication ... knowing that such communication was intercepted, shall divulge or publish the existence, contents ... of such communication ... or use such communication ... for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public....

47 U.S.C. § 605(a). Section 605(d) allows any person aggrieved by a violation of subsection (a) to bring an action in federal district court for damages or injunctive relief. The plaintiffs argue, and the defendants do not deny, that the interception and use of the satellite signal by the defendants violated the first part of subsection (a). The defendants received an interstate communication for their own benefit without being entitled thereto. They also intercepted, and divulged the existence and contents of, a radio communication without authorization.[2]

■ The defendants argue, however, that the satellite signal falls within the exception set out in subsection (a). The

---

2. Unauthorized viewing of television signals constitutes divulgement or publication of radio communications under § 605. *See California Satellite Systems v. Seimon,* 767 F.2d 1364, 1366 (9th Cir.1985).

defendants contend that because the dish used to receive the signal is now a widely available device, and because the plaintiff's programming appeals to a wide audience, the signal was "for the use of the general public." Therefore, the defendants claim, subsection (a) does not apply to NESN's transmission.

The defendant's position, though, is contrary to the case law, the statutory framework, and Congressional intent. In *Home Box Office, Inc. v. Corinth Motel, Inc.*, 647 F.Supp. 1186, 1190 (N.D.Miss.1986), the court held that, in a situation exactly analogous to this situation, the intercepted satellite television signal was not for the use of the general public. *See also American Television and Communications v. Floken*, 629 F.Supp. 1462, 1468 (M.D.Fla.1986).

In *Movie Systems, Inc. v. Heller*, 710 F.2d 492 (8th Cir.1983), the defendant intercepted a microwave signal used by the plaintiffs to transmit pay-television programs to the distributor. In a suit brought for violation of the FCA, the defendants argued that § 605 did not apply. The programs transmitted by the plaintiffs, the defendant argued, had mass public appeal, and were therefore for the use of the general public. The Court of Appeals for the Eighth Circuit expressly rejected this reasoning, noting that "for the purposes of section 605, the crucial factor in determining whether the programming is broadcasting for the use of the general public is not whether the content of the program has mass appeal or mass availability but rather, whether it was *intended* for the use of the general public. *Id.* at 494 (emphasis in original). In this case, the plaintiffs clearly intended that only Quincy Cable receive the signal for use by cable television subscribers. The plaintiffs are in the business of providing programming to paying customers, not to the general public.

The defendants' position also ignores the rest of the statute.[3] In 1984, Congress passed the Cable Communications Policy Act, Pub.L. 98–549, 98 Stat. 2779 (1984)

(the "CCPA"). In this act, Congress created a narrow exception to the broad liability of § 605(a) by exempting from liability the interception of certain satellite cable signals. Under § 605(b), private home viewers may lawfully intercept without authorization satellite cable programming if the signal is not encrypted and if a marketing system has not been established under which authorization to receive the signals is available. 47 U.S.C. § 605(b). If any of the conditions of § 605(b) are not satisfied, the statute clearly implies that the satellite signal is protected under § 605(a); and may not be intercepted without authorization.

This conclusion is supported by the legislative history of the CCPA. In an explanatory statement, Senator Packwood noted,

[Section 605] provides a specific, limited exemption under which individual satellite dish owners can be authorized to receive unscrambled signals without being subject to liability.... The amendments made by the legislation are intended, however, to provide satellite cable program suppliers in the future with two clear alternatives for the protection of their satellite transmissions. They may either scramble their signal, or leave their signal unscrambled and establish a marketing system that results in individuals being authorized to receive a marketing system that results in individuals being authorized to receive the satellite cable programming through a compensation scheme. If unauthorized interception of satellite cable programming occurs after either of these two approaches have been followed, then a satellite cable programmer will have the ability to pursue the greatly strengthened penalties and remedies new section [605] provides.

What the amendment made by section 5 of H.R. 4103 accomplishes is to retain the language of the current section 605, while adding a provision dealing solely with authorizing the receipt and use of

---

3. The cases relied upon by the defendant were decided before the 1984 amendment to the FCA. *See Orth-O-Vision v. Home Box Office*, 474 F.Supp. 672 (S.D.N.Y.1979); *Chartwell Communications Group v. Westbrook*, 637 F.2d 459 (6th Cir.1980). To the extent these cases are inconsistent with the 1984 amendment, they are unpersuasive.

unencrypted satellite programming. This authorization is carefully designed as a specific, limited exception to the general liability associated with unauthorized use.... [The current Section 605] not only prohibits unauthorized interception of traditional radio communications, but also communications transmitted by means of new technologies. For example, existing section 605 provides protection against the unauthorized reception of subscription television (STV), multipoint distribution services (MDS), and satellite communications. This amendment made by section 5 of the bill is intended to preserve this broad reach of existing section 605 and to make clear that all communications covered under section 605 will continue to be protected under new section 705(a).]

Statement of Senator Packwood, Chairman of the Committee on Commerce, Science, and Transportation, on the House Amendment to S.66, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4742, 4745–46. Since the defendants do not fall within the well defined limits of § 605(b), Congress clearly intended that they be subject to the liability provisions of § 605(a). Therefore, the defendants are, as a matter of law, liable under 47 U.S.C. § 605(d) for violation of the FCA. The plaintiffs' motion for partial summary judgment on the issue of liability under the FCA should be granted.

### B. *The Chapter 93A Claim*

The plaintiffs also move for summary judgment on the issue of liability under M.G.L. c. 93A § 11, which imposes liability for unfair and deceptive business practices. In response, the defendants present a number of arguments. First, the defendants argue that the Massachusetts Legislature did not intend for M.G.L. c. 93A to apply to disputes in the area of communications. Second, the defendants contend that M.G.L. c. 93A is preempted by federal law. Third the defendants argue that their actions were not "unfair and deceptive acts," and thus did not violate M.G.L. c. 93A.

■ The first question to be addressed, then is whether M.G.L. c. 93A applies to alleged violations of § 605 of the FCA. The Supreme Judicial Court of Massachusetts has held that M.G.L. c. 93A does not apply to acts that allegedly violate federal securities laws. *See Cabot Corp. v. Baddour*, 394 Mass. 720, 477 N.E.2d 399 (1985). In holding that M.G.L. c. 93A does not apply to the securities area, the court in *Cabot Corp.* noted that the state legislature had enacted a comprehensive regulatory scheme for the registration and sale of securities. *Id.* at 723, 477 N.E.2d 399. This statute prohibited the acts allegedly committed by the defendant, and provided for limited remedies. *Id.* at 724, 477 N.E. 2d 399. Since M.G.L. c. 93A provided greater private remedies than those provided in the state Uniform Securities Act, the court concluded that the legislature did not intend M.G.L. c. 93A to apply to acts covered by that statute. *Id.* at 725–26, 477 N.E.2d 399.

In this case, however, there is no such comprehensive legislative scheme that applies to the defendants' acts. The only possible relevant statute is M.G.L. c. 166A, which establishes procedures and guidelines for the licensing of community antenna television systems (CATV systems).[4] Section 21 of that chapter imposes a criminal penalty on anyone who attaches any device to a CATV cable without authorization. The statute does not prohibit interception of the signals before they are transmitted by the CATV operator, nor does the statute provide a private cause of action for a CATV operator whose signal is intercepted. Application of M.G.L. c. 93A to this case does not, therefore, conflict with any other state statutory schemes, as was the case in *Cabot Corp.* As such, there is no apparent reason why M.G.L. c. 93A should not apply to this case.

■ The next issue is whether M.G.L. c. 93A is preempted by federal law. By now, it is almost a truism that a state law is

---

**4.** A CATV system is a facility that receives the signals broadcast by one or more television stations and retransmits the signals via cable to paying subscribers. M.G.L. c. 166A § 1. Quincy Cable is a CATV system.

preempted by federal law where Congress expresses a clear intent to pre-empt state law, when there is actual conflict between federal and state law, where compliance with both federal and state law is physically impossible, or where Congress has legislated comprehensively, thus occupying an entire field of regulation. *Louisiana Public Service Comm'n v. F.C.C.*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). The touchstone of all preemption analyses, of course, is the question whether Congress intended that federal regulation supersede state law. *Id.* at 369, 106 S.Ct. at 1898–99. In this case, there is no clear Congressional expression that the state may not provide penalties for video piracy. Quite the opposite is true. In 47 U.S.C. § 605(e), Congress provided that nothing in § 605 shall affect any right, obligation, or liability under any applicable state or local law. Despite this seemingly unambiguous clause, the defendant argues that Congress has comprehensively regulated the field of communications law, thus impliedly preempting all state laws regulating to communications. The defendant makes this broad assertion, however, without any support in case law and without any analysis of the federal statutory scheme.

A consideration of the statutory scheme in the area of cable television shows that Congress did not intend to foreclose all state regulations. The savings clause in § 605, which is noted above, is certainly one indication that Congress did not intend to supersede state law prohibiting unauthorized interception of radio transmissions generally. This conclusion is buttressed by the Cable Communications Policy Act, 47 U.S.C. §§ 521–559 (West Supp.1987). One of the purposes of the CCPA is to establish guidelines for the exercise of federal, state and local authority with respect to cable television systems. 47 U.S.C. § 521(3). Regulation of cable operators is entrusted primarily to "franchising authorities." *See* 47 U.S.C. §§ 531(c), (d), 541. A franchising authority is defined as "any governmental entity empowered by Federal, State, or lo-

cal law to grant a franchise." 47 U.S.C. § 522(9). In general, cable operators are prohibited from offering cable services without a franchise. 47 U.S.C. § 541(b). Franchises, of course, are awarded by a franchising authority. The statute does, however, limit the power of franchising authorities to regulate subscription rates. *See* 47 U.S.C. § 543. The CCPA also limits the powers of a franchising authority to regulate cable operators. 47 U.S.C. § 544. This regulatory scheme clearly shows Congress expressly intended that state and local governments play primary roles in regulation of cable television. *See* H.Rep. No. 98–934, 98th Cong., 2d Sess. 19, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4655, 4656.

It is also reasonable to assume that Congress, in giving states the authority to grant franchises, intended that states also have the authority to protect the franchisees by prohibiting unauthorized interception of cable signals. Indeed, in section 553, Congress prohibits unauthorized interception of cable signals, and creates a private cause of action for persons aggrieved by such an interception. Here, too, Congress provided that "nothing in this subchapter shall prevent a State or franchising authority from enacting or enforcing laws, consistent with this section, regarding the unauthorized interception or reception of any cable service or other communications service." 47 U.S.C. § 553(c)(3)(D). While this section does not apply to interception of satellite signals which are eventually transmitted over a cable system, *see* H.Rep. No. 98–934 at 83, 1984 U.S.Code Cong. & Admin.News at 4720, it does show that Congress intended to allow the states to create and enforce laws prohibiting unauthorized interception and use of transmissions intended for use by cable operators. Therefore, M.G.L. c. 93A is not preempted by federal communications law.

■ We now come to the most difficult issue presented: whether the defendants' actions constituted an unfair or deceptive act or practice under M.G.L. c. 93A §§ 2, 11.[5] In passing c. 93A, the Massachusetts

---

5. A cause of action grounded on an alleged

violation of c. 93A is an appropriate matter for

legislature chose not to set out a statutory definition of unfair trade practices. Instead, c. 93A, § 2(b) directs the courts to consider interpretations of unfair acts and practices under the Federal Trade Commission Act (FTCA), as construed by the Federal Trade Commission (FTC), and the federal courts. *Commonwealth v. DeCotis*, 366 Mass. 234, 241, 316 N.E.2d 748 (1974). While this court is not aware of any FTC decision addressing the practices at issue here, the FTC has set out general guidelines it uses in determining whether a practice is "unfair" for the purposes of the FTCA. First, the FTC notes that a practice need not be deceptive or misleading, nor monopolistic in order to be prohibited by the FTCA. 29 Fed.Reg. 8325, 8354 (1964). Rather, the FTC will consider the following factors to determine if a practice is unfair. The first factor is whether the practice, without having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, whether the practice is within at least the penumbra of some common-law, statutory or other established concept of unfairness. *Id.* at 8355. The second consideration is whether the practice is immoral, unethical, oppressive, or unscrupulous. *Id.* Finally, the FTC noted that one must consider whether the practice causes substantial injury to consumers, competitors, or other businessmen. *Id.* See also *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 396, 321 N.E.2d 915 (1975).

Conversely, the Massachusetts Supreme Judicial Court has noted that not every unlawful act is automatically an unfair one under M.G.L. c. 93A. *Mechanics National Bank of Worcester v. Killeen*, 377 Mass. 100, 109, 384 N.E.2d 1231 (1979). In *Mechanics National Bank*, the defendant bank breached its contract by foreclosing on a mortgage granted it on certain stocks owned by the plaintiff. The plaintiff sought relief under M.G.L. c. 93A, arguing that the unlawful foreclosure was an unfair practice. The court disagreed, however, and noted that to determine whether an act is "unfair," the courts should analyze the effect of the unlawful conduct upon the public or consumer. *Id.* at 109, 384 N.E.2d 1231. The Court went on to state, "[B]alancing the equities in the relationship of the parties, a major factor in determining unfairness under G.L. c. 93A § 2, we conclude that the bank's conduct was not unfair. We discern neither an over-zealous seller taking economic advantage nor a defenseless consumer." *Id.* at 110, 384 N.E.2d 1231. In essence, these factors are the same as those set out by the FTC.

Applying these factors to this case, I hold that the defendants' actions constituted an unfair practice under M.G.L. c. 93A § 2. As discussed above, when Congress passed the Cable Communications Policy Act, it was concerned about theft of cable service. The Committee Report states that "theft of service is depriving the cable industry of millions of dollars of revenue each year which it should otherwise be receiving." H.Rep. No. 98–934, 98th Cong., 2d Sess., 83, *reprinted in* 1984 U.S. Code Cong. & Admin.News at 4720. The report goes on to state that this loss poses a major threat to the economic viability of cable operators and programmers, and creates unfair burdens on cable subscribers who are forced to subsidize those who are getting the service for free. *Id.* In passing the CCPA, then, Congress established the policy that only those who are authorized receive cable service. The defendants' actions unquestionably violate this policy. Moreover, the Committee Report also recognizes that unauthorized interception of cable programming significantly injures the cable programmers and operators, and the paying subscribers. Balancing the equities, the burden imposed on the plaintiffs by unauthorized reception of cable signals is potentially very great, while the burden imposed by requiring authorization on those who wish to receive cable programming is comparatively very

summary judgment if there is no genuine issue of material fact. *Chub v. Electric Insurance Co.*, 17 Mass.App.Ct. 61, 455 N.E.2d 646 (1983). As

noted above, there is no material issue of fact in this case.

**1144**

minor. The defendants are not generally prohibited from receiving and using the plaintiffs' transmissions. They are only prohibited from using them without authorization. In light of these considerations, the defendants' actions were unfair under the FTC guidelines and, consequently, M.G. L. c. 93A. Therefore, the plaintiffs' motion for summary judgment on the issue of defendants' liability under M.G.L. c. 93A § 11 should be granted.

Order accordingly.