GOLLIHUE et al., Appellees,

v.

CONSOLIDATED RAIL CORPORATION, Appellant.

GARRETT, Admr., Appellee,

v.

CONSOLIDATED RAIL CORPORATION, Appellant.*

[Cite as *Gollihue v. Consol. Rail Corp.* (1997), 120 Ohio App.3d 378.]

Court of Appeals of Ohio,
Third District, Union County.

Nos. 14–96–23 and 14–96–24.

Decided July 7, 1997.

380

382

*Leeseberg, Maloon, Schulman & Valentine Company, L.P.A.,* and *Allen Schulman, Jr.,* for appellees, Thomas Gollihue III et al.

*Clark, Perdue, Roberts & Scott Co., L.P.A.,* and *Paul O. Scott,* for appellee, Ada Garrett.

*Vogelgesang, Howes, Lindamood & Brunn, Paul R. Reiners* and *Kimberly K. Wyss,* for appellant.

THOMAS F. BRYANT, Judge.

Defendant-appellant, Consolidated Rail Corporation ("Conrail"), appeals from a judgment entered in the Union County Court of Common Pleas, awarding damages for wrongful death to plaintiff Ada Garrett, administrator of the estate of Bernard Garrett, and damages for personal injury to plaintiffs Thomas Gollihue and Cynthia Gollihue. Initially Garrett's wrongful death claim was filed separately from the Gollihues' personal injury case, but the cases were consolidated by the Union County Court of Common Pleas for purposes of trial. Therefore, because the appeals arise from a single trial, although the cases were separately appealed, briefed, and argued, this court will address the assignments of error and the issues in a single written opinion.

This case concerns a May 6, 1994, accident involving a Laidlaw sanitation truck and a Conrail train at the Converse Road crossing near the intersection of Converse and Currier Roads in Jerome Township, Union County, Ohio. Mr. Gollihue, a Laidlaw employee, was driving the sanitation truck, and Mr. Garrett was riding as a passenger. The two men were traveling south on Currier Road, which runs parallel to a Conrail railroad track. When the truck reached the intersection of Currier Road and Converse Road, Gollihue stopped at the stop sign and proceeded to make a right turn towards the railroad tracks. Gollihue then drove approximately thirty-three feet, and, as the truck pulled over the tracks, it was struck by a Conrail train traveling south at approximately fifty miles per hour.

As a result of the collision, Bernard Garrett was fatally wounded, and Thomas Gollihue sustained permanent injuries. Ada Garrett and Thomas and Cynthia Gollihue then commenced actions in the Union County Common Pleas Court seeking to recover damages from Conrail, as a result of, *inter alia*, Conrail's alleged negligent failure to properly guard and maintain the Converse Road crossing. In addition to their negligence claims, both Mrs. Garrett and the Gollihues filed punitive damages claims against Conrail. Further, Mrs. Gollihue filed a derivative claim seeking to recover for loss of consortium.

Conrail moved for summary judgment on the grounds that the claim of inadequate signals had been preempted by federal law and that the undisputed evidence did not support the punitive damages claims. Conrail also filed a motion in limine to preclude evidence of subsequent remedial measures, specifically the subsequent installation of active warning devices at the Converse Road crossing. The trial court denied Conrail's motion for summary judgment but granted its motion in limine. The consolidated case then proceeded to trial on the claims of inadequate signals and punitive damages.

On May 3, 1996, the jury returned a verdict for the plaintiffs. It awarded the Gollihues compensatory damages of $1,500,000 and punitive damages of $2,000,000 and Ada Garrett compensatory damages of $2,007,000 on her wrongful death claims and punitive damages of $6,000,000 on her claims for property damage. On May 17, 1996, the Union County Court of Common Pleas entered judgments for the plaintiffs in the amount of the requested verdicts plus costs and interest from the date of judgment. By judgment entry of June 3, 1996, the court denied Conrail's posttrial motions for judgment notwithstanding the verdicts and for a remittitur.

It is from this judgment that Conrail appeals, citing the following assignments of error:

"I. The trial court erred in allowing evidence that the Public Utilities Commission of Ohio, after the accident, had selected the subject grade crossing for installation of active warnings.

"II. The trial court erred in denying Conrail's motion for summary judgment where the federal laws governing railroad safety expressly preempt the state common law on which plaintiffs base their claim that Conrail negligently failed to install automatic gates and flashing lights.

"III. The trial court erred in holding Conrail to an 'ordinary care' standard, and in permitting punitive damages to be imposed under that standard, based on a case that (1) did not overrule existing law that a railroad's duty to install active warning devices arises only at extra-hazardous crossings and (2) was decided after the accident at issue.

"IV. The trial court erred in denying Conrail's motion for judgment notwithstanding the verdict without opinion and violated Conrail's procedural due process rights.

"V. The trial court erred in refusing to order a remittitur of the punitive damages award where that award, in an amount 60,000 times greater than the compensatory damage award, violates Ohio common law, the Due Process Clause of the United States Constitution, and Ohio's statutory prohibition on punitive damages in wrongful death cases."

I

Subsequent Remedial Measures

In its first assignment of error, Conrail argues that the trial court permitted the admission of evidence in violation of Evid.R. 407. Specifically, the court allowed plaintiffs to introduce evidence demonstrating that after the collision, the Public Utilities Commission of Ohio ("PUCO") upgraded the crossing and ordered

the installation of active traffic warning devices. Since the sole issue before the jury was whether Conrail was liable for failing to install active warning devices at this crossing, appellant argues that the court committed prejudicial error in permitting testimony regarding subsequent remedial measures to be admitted as evidence of Conrail's negligence.

After the collision at the Converse Road crossing, PUCO ordered Conrail to proceed with the installation of active warning devices at this intersection. At the time of the collision, the crossing was equipped with passive traffic control devices consisting of railroad advance warning signs and "Buckeye crossbucks." The crossbucks are dual-paneled red and white striped shields mounted on posts with the word "YIELD" printed vertically down the center of the shields. No active devices such as flashing lights or gates existed at the crossing at the time of the collision.

While the PUCO had selected the grade crossing for the installation of active warnings after the collision, at the time of the trial the active warning devices had not been installed. In the interim, however, the Ohio Department of Transportation ordered the installation of additional stop signs at the crossing. Conrail filed a motion in limine to preclude "plaintiff, plaintiff's counsel, or any witness called by plaintiff from mentioning or alluding to the installation of a stop sign or planned installation of flashers and gates at the Converse Road Crossing subsequent to the collision."

In support of this motion, Conrail cited Evid.R. 407 and argued that the introduction of evidence regarding the subsequent remedial measures would be extremely prejudicial and improper because it would imply that the failure to install active warning devices before the collision constituted negligence by the defendant. While the court agreed with Conrail's argument and granted its motion, during trial the court reconsidered this issue and permitted the introduction of evidence regarding the PUCO's subsequent selection of the Converse Road crossing for an upgrade to active traffic warning devices. The trial court explained that the evidence of the PUCO's decision would be admissible because Conrail opened the door to the admission of the evidence in its cross-examination of plaintiff's witness, Joseph Reinhardt.

Reinhardt, a project coordinator for the PUCO, was questioned by appellant's counsel as follows:

"Q. Does the Public Utilities Commission work with Conrail with respect to upgrading crossings?

"A. Yes, sir.

"Q. How does that work? Tell the ladies and gentlemen of the jury what the PUCO and Conrail do.

"A. We do have a handful of programs active within the State of Ohio. The primary program that I coordinate is based on a database which I receive from Washington, D.C., which helps identify crossings for, potential crossings for lights and gates. * * *

"Q. Do you ever personally meet with any of the Conrail employees with respect to making decisions about which crossings are going to be upgraded, and which crossings are not?

"A. Yes.

"Q. Is the basic decision made upon a determination to upgrade most dangerous crossings first, and work down the list?

"A. Yes, sir.

"Q. How many crossings have been upgraded since the program has been initiated?

"A. I have upgraded approximately 700 crossings."

Thereafter, appellant's counsel questioned the witness further regarding the amount of Conrail crossings that had been upgraded and Conrail's active participation in the upgrade process. When the defense ceased questioning Reinhardt, plaintiff asked the court for leave to question him on redirect regarding whether the crossing at Converse and Currier Roads had been selected for an upgrade by the PUCO. Plaintiff argued that Conrail had opened the door for this line of questioning by inquiring about the PUCO's system of prioritizing crossings. The court agreed and permitted the following line of questioning:

"Q. Will you tell these ladies and gentlemen of the jury whether this crossing at Converse and Currier roads has been ordered to be upgraded to flashing lights and gates by the State of Ohio?

"A. That is true. Correct. Yes, sir.

"Q. The State of Ohio looked at it, put on an entry, and ordered the Railroad to upgrade it to flashing lights and gates. Is that correct?

"A. Yes, sir.

"Q. And one of the reasons that they ordered it to be upgraded was because of nearby intersecting roadways, is that correct?

"A. Yes, sir."

Appellant argues that the court committed prejudicial error when it permitted this testimony. It contends that court undermined Evid.R. 407 by admitting evidence of the PUCO's order to install gates and flashers at the crossing after the collision. By allowing the admission of that evidence, appellant contends, the

court permitted the jury to infer that the failure to install those devices before the accident constituted negligence on the part of Conrail.

In addition, appellant argues that its counsel did not open the door for the admission of that testimony. Since Conrail did not ask any questions concerning the specific crossing at Converse Road, it contends that the court's decision was not supported by the record. Furthermore, appellant argues that the questioning of Reinhardt regarding the system of upgrades was used to establish that Conrail was an active participant in this process, not to call into question the status of the crossing. Numerous times during the trial, the plaintiffs implied that Conrail did nothing to improve the safety of its crossings. Therefore, Conrail argues, the testimony elicited from Reinhardt was aimed at refuting this implication and demonstrating that Conrail cooperated with PUCO in maintaining and improving railroad safety.

In examining appellant's argument, we must first determine whether this alleged error was preserved for purposes of this appeal. Appellee correctly argues that Conrail failed to object during the redirect examination of Reinhardt. While the court did grant appellant's motion in limine to preclude the admission of the subsequent remedial measures, that motion was insufficient to preserve this issue for appellate review.

The Supreme Court of Ohio, in *State v. Grubb* (1986), 28 Ohio St.3d 199, 201, 28 OBR 285, 287, 503 N.E.2d 142, 145, defined a motion in limine as "a precautionary request, directed to the inherent discretion of the trial judge, to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside the presence of the jury." The court then examined whether a ruling on a motion in limine preserves the record on appeal. Following Palmer's Ohio Rules of Evidence Rules Manual (1984), the court held that the ruling is a "tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated but has not yet been presented in its full context. *An appellate court need not review the propriety of such an order unless the claimed error is preserved by an objection, proffer, or ruling on the record when the issue is actually reached and the context is developed at trial.*" (Emphasis *sic.*) Therefore, following the precedent established by the Ohio Supreme Court, we hold that the failure to object to evidence at the trial constitutes a waiver of any challenge, regardless of the disposition made on a preliminary motion in limine.

Reinhardt testified that the PUCO upgrades the most hazardous crossings first. It is clear that since the Converse Road crossing had not been upgraded at the time of the collision, defendant was offering Reinhardt's testimony to establish that according to the PUCO, the crossing was not hazardous. While we

acknowledge that defendant certainly had the right to refute plaintiffs' evidence that the Converse Road crossing was hazardous, Conrail's failure to raise a timely objection to the statements implicating the subsequent remedial measures waived error and therefore renders this court powerless to offer a remedy.

■ Although we overrule appellant's first assignment of error on the grounds that it was not preserved for purposes of this appeal, we also note that the trial court was correct in ruling that the defendant had opened the door for the admission of evidence regarding the PUCO's decision to order an upgrade of the subject crossing.

The main thrust of plaintiffs' argument for liability was the hazardous nature of the Conrail crossing at Converse Road. As we have noted, Conrail's cross-examination of Reinhardt was intended to establish that the crossing was not hazardous, since the PUCO had not ordered an upgrade of the crossing prior to the crash. This was not the first instance in which this issue was presented to the jury without objection by Conrail.

Prior to the testimony of Reinhardt, the jury viewed the videotape deposition of Jerome Cossel, the chief engineer of construction for Conrail. During plaintiff's direct examination of Cossel, the witness described the government's system of rating the safety of railroad crossings. In order to compile a crossing's hazard index, Cossel stated that Conrail furnishes data regarding the speed and number of the trains using the crossing, the frequency of automobile traffic and school buses crossing the tracks, and the angle and sight distance the motorist faces when approaching the crossing.

Plaintiffs then questioned Cossel regarding how the hazard index is used to establish a priority list for the upgrade of railroad crossings. During this line of questioning, the following testimony was elicited:

"Q. If you have to prioritize in accordance with hazard, with this hazard scale, you would agree with me that you prioritize this because of money. I mean, you're, you have a limited pool of resources of money, available, and you are going to get to the worst crossing first. Would you agree with that?

"A. Well—

"Q. Isn't that the system?

"A. The system is obviously that you attack the most hazardous first.

"Q. Okay.

"A. We have been attacking the most hazardous first for the last 20–plus years, I guess 24 now, so we have eliminated from the passive category an awful lot of crossings, and as you go down the list, obviously. And I don't know where this ranked, quite honestly. It obviously was not one of the most hazardous in

the State of Ohio. Obviously, as long as there's one single crossing, as Mr. Scott had asked me previously, I'd like to see no crossings."

It is clear that this line of questioning brought into issue the hazardous nature of the crossing at Converse Road. This was the exact issue, however, that defendant sought to preclude in its motion in limine. Although the testimony specifically mentioned the crossing and its probable standing on the hazard index, defendant did not raise an objection and therefore waived the error of which he now complains by opening the door for later questioning on this issue.

■ As we previously stated, a motion in limine is an interlocutory ruling, the granting of which operates as a tentative order which can be later modified depending on the circumstances at trial. The court properly modified its prior ruling on the motion in limine because the defendant permitted the introduction of testimony regarding the crossing without making an objection. In doing so, Conrail opened the door for the admission of evidence regarding the PUCO's decision to upgrade the Converse Road crossing. Accordingly, we overrule appellant's first assignment of error.

## II

### Federal Preemption

Conrail's second assignment of error argues that the trial court erred when it denied Conrail's motion for summary judgment. In this motion, Conrail argued that plaintiffs' claims alleging inadequate signals were preempted by federal law. Relying on the Federal Rail Safety Act of 1970 ("FRSA"), Section 421 et seq., Title 45, U.S.Code and *CSX Transp. v. Easterwood* (1993), 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387, Conrail argued that preemption was appropriate since federal funds were used to install the warning devices at the Converse Road crossing. Therefore, Conrail contends that the trial court erred when it refused to grant summary judgment on this issue.

The principle of federal preemption of state law arises directly from the Supremacy Clause, Clause 2, Article VI, United States Constitution. Under the Supremacy Clause, "the Laws of the United States * * * shall be the supreme Law of the Land * * *, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Under this constitutional authority, Congress may preempt state law.

■ While Congress does have the power to preempt state law, there is a strong presumption against preemption. Consideration of preemption issues begins with the "assumption that the historic police powers of the States [are] not to be superseded by * * * [a] Federal Act unless that [is] the clear and manifest

purpose of Congress." *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459. Therefore, there is a reluctance to preempt state laws relating to health and safety matters because these areas have been the exclusive concern of the states. See *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995), 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695; *Hillsborough Cty. v. Automated Med. Laboratories, Inc.* (1985), 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714. Furthermore, the presumption against preemption exists if preemption would deny an injured party all judicial remedies, especially in the face of congressional silence. *Silkwood v. Kerr–McGee Corp* (1984), 464 U.S. 238, 251, 104 S.Ct. 615, 622, 78 L.Ed.2d 443, 454–455.

■ In *Louisiana Pub. Serv. Comm. v. Fed. Communications Comm.* (1986), 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369, the Supreme Court summarized the various standards for determining whether a federal law preempts a state law:

"Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress." (Citations omitted.) *Id.* at 368–369, 106 S.Ct at 1898, 90 L.Ed.2d at 381–382.

■ While the court articulated these various standards, it emphasized that the "critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law." *Id.* Thus our focus in this appeal is to determine whether Congress intended to preempt a state common-law tort action alleging that a passive warning device, installed with federal funds, provided an inadequate signal to a railroad crossing.

To answer this question, we must first examine contents of the federal law. FRSA, Section 421 et seq., Title 45, U.S. Code, was enacted in 1970 to "promote safety in all areas of railroad operations[,] * * * to reduce railroad related accidents, * * * to reduce deaths and injuries to persons and to reduce damages to property caused by accidents involving any carrier of hazardous materials." *Id.* at Section 421. The statute directs the Secretary of Transportation to "undertake a coordinated effort toward the objective of developing and implementing solutions to the grade crossing problems" under the authority of the FRSA as well as under the secretary's authority over highway, traffic, and motor vehicle safety. *Id.* at Section 433.

■ The FRSA contains an express preemption provision. In Section 434, Congress declared:

"[L]aws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A state may adopt or continue in force any law, rule, regulation, order, or standard, relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement."

This section plainly states that there is no preemption until the secretary adopts a rule or regulation covering the same subject matter as state law.

■ The question then arises of whether the secretary has adopted a rule or regulation that covers the subject matter of the state common-law requirement implicated in the present case. This question is controlled by the Supreme Court's decision in *CSX Transp., Inc. v. Easterwood* (1993), 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387.

In *Easterwood,* the plaintiff brought a wrongful death action in a Georgia state court alleging that CSX Transportation was negligent in failing to maintain adequate warning devices at the railroad crossing at which her husband was killed. CSX argued that the claim was preempted by the FRSA and the Highway Safety Act of 1973, and the regulations promulgated pursuant to those statutes.[1]

In deciding the issue of preemption, the Supreme Court first noted:

"According to § 434 [Title 45, U.S. Code], applicable federal regulations may pre-empt any state 'law, rule, regulation, order, or standard relating to railroad safety.' * * * Thus, the issue before the Court is whether the Secretary of Transportation has issued regulations covering the same subject matter as Georgia negligence law pertaining to the maintenance of, and the operation of trains at, grade crossings." 507 U.S. at 664, 113 S.Ct. at 1737–1738, 123 L.Ed.2d at 396–397.

The court then examined whether federal grade crossing regulations covered the same subject matter as plaintiff's state law claims. The court reviewed a series of regulations adopted by the Secretary of Transportation that address grade crossing safety and speed, including the regulation that requires that the several states comply with the Manual on Uniform Traffic Control Devices for Streets and Highways ("MUTCD"), and concluded that Section 646.214(b)(3) and (4), Title 23, C.F.R., are regulations that, for purposes of preemption, sufficiently

---

1. These regulations include Sections, 646, 655, and 924, Title 23, C.F.R.

cover the subject of traffic control devices at railroad crossings to preempt state negligence actions.

Section 646.214(b)(3), Title 23, C.F.R., provides:

"(3)(i) Adequate warning devices under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

"(A) Multiple main line railroad tracks.

"(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

"(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.

"(D) A combination of high speeds and moderately high volumes of highway and railroad traffic,

"(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions,

"(F) A diagnostic team recommends them."

These regulations, the court stated, do preempt state law:

"[These regulations] displace state and private decision-making authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained. Indeed, §§ 646.214(b)(3) and (4) effectively set the terms under which railroads are to participate in the improvement of crossings. The former section envisions railroad involvement in the selection of warning devices through their participation in diagnostic teams which may recommend the use or nonuse of crossing gates. §§ 646.214(b)(3)(i)(F) and (3)(ii). Likewise, § 646.214(b)(4), which covers federally funded installations at crossings that do not feature multiple tracks, heavy traffic, or the like, explicitly notes that railroad participation in the initial determination of 'the type of warning device to be installed' at particular crossings is subject to the Secretary's approval. * * * In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to

identify and/or repair dangerous crossings." *Easterwood,* 507 U.S. at 670–671, 113 S.Ct. at 1741, 123 L.Ed.2d at 400–401.

Therefore, the court held, when these regulations apply, state tort law is preempted. However, in *Easterwood,* the court found that the regulations did not preempt state law because at the time of the accident the federal funds had not been used to install the warning devices.

The Ohio Supreme Court has also focused on the expenditure of federal funds when addressing the preemption argument. In *Carpenter v. Consol. Rail Corp.* (1994), 69 Ohio St.3d 259, 631 N.E.2d 607, the court held:

"Before a state law governing warning devices will be deemed preempted, federal funds must actually have been committed and spent, and the 'warning devices,' as defined in Sections 646.204(i) and (j), Title 23, C.F.R., must have been installed." *Id.* at 263, 631 N.E.2d at 610.

Many courts interpreting these two cases have concluded that the preemption analysis turns on whether federal funds were used in the installation of the warning devices. These courts have held that once federal funds have been expended pursuant to Section 646.214(b)(3) and (4), Title 23, C.F.R., for the installation of a warning device, preemption automatically occurs. We find this conclusion to be illogical and contrary to the rationale of *Easterwood.*

In *Easterwood,* the Supreme Court noted that pursuant to Section 646.214(b)(3) and (4), "a project for the improvement of a grade crossing must either include an automatic gate or receive FHWA approval if federal funds 'participate in the installation of the [warning] devices.'" *Easterwood,* 507 U.S. at 670, 113 S.Ct. at 1741, 123 L.Ed.2d at 400. Thus the expenditure of federal funds is but one element necessary to invoke federal preemption of a state law negligence claim alleging inadequate signals in the absence of an automatic gate. Also necessary, under the *Easterwood* holding, is the approval of the Federal Highway Administration ("FHWA").

In its motion for summary judgment, defendant submitted the affidavit of F.X. Giacoma, a principal engineer for Conrail. In this affidavit, Giacoma stated that the Buckeye crossbuck signs in place at the Converse Road crossing on the date of the accident were purchased and installed with federal funds. However, there is no further documentation in the record to establish that the FHWA approved the crossbucks as being adequate to protect motorist safety at the crossing. We find that such approval is necessary before the state negligence claim will be preempted in this situation.

The language of Section 646.214(b)(3) and (4) makes it clear that the use of automatic gates and flashing lights will be required under two situations. First, automatic gates and lights are required if any of the conditions described in

Subsections A through E are present, *i.e.*, multiple tracks, high train speed, high volume of traffic, etc. Second, these devices will be required if a diagnostic team recommends their use. Subsection 3(ii) specifically requires that before the FHWA can find that automatic gates with flashing light signals are *not* required, a diagnostic team must verify that these devices are not appropriate. If such a determination is made, Subsection 4 is then implicated because this section comes into play only for "crossings where the requirements of § 646.214(b)(3) are not applicable."

Conrail contends that Subsection 4 is applicable in the present case and argues that the secretary in effect approved the adequacy of the reflectorized crossbucks at the Converse Road crossing. In support of this argument, appellant cites *Hester v. CSX Transp.* (C.A.5, 1995), 61 F.3d 382, in which the U.S. Fifth Circuit Court of Appeals concluded that "the fact that federal funds participated in the installation of the warning devices legally presupposes that the Secretary * * * determined that the safety devices installed were adequate to their task." Appellant, therefore, argues that FHWA approval is apparent through the expenditure of federal funds. We find this argument not only troubling, but problematic.

It is clear from a plain reading of the statute that in order for Subsection 4 to be applicable to the case *sub judice*, a diagnostic team must have determined that the requirements of Subsection 3(i) have not been met. Only then can the decision to install a particular device be made by a state agency and/or the railroad. Even if a diagnostic team evaluates the conditions of the crossing and the state agency or railroad determines what type of device should be installed, this determination is still subject to the approval of the FHWA under the express mandate of Section 646.214(4), Title 23, C.F.R.

In the present case, Conrail has offered no evidence of FHWA approval. It merely asserts that the federal funds were expended and that the expenditure is evidence that the Secretary of Transportation approved the adequacy of the crossbucks. After examining the language of Section 646.214(b)(3) and (4), we are persuaded that this regulation requires more than the expenditure of federal funds before state negligence law will be preempted.

This interpretation of Section 646.214(b)(3) and (4), which requires the use of a diagnostic team and FHWA approval, is in accordance with other railroad regulations. For example, the MUTCD [2] requires engineering and traffic analy-

---

**2.** "Engineering Study Required—The decision to use a particular device at a particular location should be made on the basis of an engineering study of the location. Thus, while this Manual provides standards for design and application of traffic control devices, the Manual is not a substitute for engineering judgment." MUTCD at 1A–4.

sis by a diagnostic team to determine which type of traffic control device is required at a crossing. Section 646.204(g), Title 23, C.F.R. defines a diagnostic team as "a group of knowledgeable representatives of the parties of interest in a railroad-highway crossing or group of crossings." After the engineering study by the diagnostic team, the MUTCD states, the final selection of the proper signal device is made by the public agency with jurisdictional authority.[3]

Regulations like the MUTCD require joint responsibility [4] between the public agency and the railroad. This requirement is compatible with the *Easterwood* decision, in which the court stated:

"Certainly there is no explicit indication in the regulations of 23 CFR Pt. 924 that the terms of the Federal Government's bargain with the States require modification of this regime of separate spheres of responsibility. * * * In fact, the scheme of negligence liability could just as easily complement these regulations by encouraging railroads—the entities arguably most familiar with crossing conditions—to provide current and complete information to the state agency responsible for determining priorities for improvement projects in accordance with § 924.9." [5] *Easterwood,* 507 U.S. at 668, 113 S.Ct. at 1739, 123 L.Ed.2d at 399.

Therefore, in *Easterwood,* the United States Supreme Court recognized that state tort law can be compatible with federal regulations regarding railroad safety.

. Thus, because we believe that state common-law can complement the FHWA and that the expenditure of federal funds on railroad traffic warning devices does not automatically result in preemption of state common-law tort actions, this court joins a minority of the federal courts that have addressed this issue.

In *Shots v. CSX Transp.* (C.A.7, 1994), 38 F.3d 304, the Seventh Circuit Court of Appeals held that the Secretary of Transportation's approval of a state railroad agreement to install reflectorized crossbucks with federal funds was not a determination that these devices would adequately protect every crossing covered by the agreement. The court explained:

---

3. MUTCD Section 8A–1.

4. Section 8A–1 of the MUTCD provides, "The highway agency and the railroad company are entitled to jointly occupy the right of way in the conduct of their assigned duties. This requires joint responsibility in the traffic control function between the public agency and the railroad."

5. Section 924, Title 23, C.F.R. the Highway Safety Improvement Program, provides for improvement of safety on all public roads and for interaction between the FHA, the state, and local government officials, when practical.

"[W]e do not think it can be realistically said * * * that 'the Secretary has determined the devices to be installed' at these crossings merely because he authorized federal funds to bring them up to minimum standards, utilizing passive warning devices solely. Indeed, it would have been an extraordinary act of irresponsibility for the Secretary of Transportation, by approving the agreement, to preclude tort liability for the railroad's failing to have active warning devices at any of the thousands of crossings covered by the agreement, or otherwise to prevent the state from requiring adequate safety devices at the busiest or most dangerous of these crossings, when no one in the federal government had made a determination that the improvements to be made would bring all the crossings up to a level of safety adequate to satisfy federal standards." *Id.* at 309.

The court concluded that under Section 646.214(b)(4), the secretary's specific approval of a warning system, in addition to federal financial participation, was necessary before state tort law would be preempted.[6]

██ Because we find this conclusion to be clearly mandated by the language of Section 646.214(b)(3) and (4), we hold that if the federal government has specifically approved an upgrade of a crossing and has participated financially in the upgrade process, federal preemption will lie when the approved upgrade is actually installed.[7]

Because a question of fact remained whether federal approval was obtained for the passive warning devices at the Converse Road crossing, we find that Conrail's motion for summary judgment was properly denied. Appellant's second assignment of error is therefore overruled.

## III

### Standard of Care

In its third assignment of error, appellant argues that the trial court improperly instructed the jury regarding the standard of care owed by Conrail. Although Conrail submitted a proposed jury instruction that it owed a duty to install warnings not required by statute only at particularly hazardous crossings, in

---

**6.** See also *Thiele v. Norfolk & W. Ry.* (C.A.7, 1995), 68 F.3d 179, *Eldridge v. Missouri Pacific RR.* (E.D.Okla.1993), 832 F.Supp. 328.

**7.** This holding comports with the Ohio Supreme Court's requirement in *Carpenter,* 69 Ohio St.3d 259, 631 N.E.2d 607, that before a state law will be preempted, federal funds must actually have been spent on the warning device and the device must actually have been installed. See, also, *Freeman v. Norfolk & W. Ry.* (1994), 69 Ohio St.3d 611, 615, 635 N.E.2d 310, 314–315; *In re Miamisburg Train Derailment Litigation* (1994), 68 Ohio St.3d 255, 626 N.E.2d 85.

accordance with *Hood v. New York, Chicago & St. Louis Rd. Co.* (1957), 166 Ohio St. 529, 3 O.O.2d 12, 144 N.E.2d 104, the trial court charged the jury that the railroad's duty was one of ordinary care.

The ordinary care standard was first espoused in *Matkovich v. Penn Cent. Transp. Co.* (1982), 69 Ohio St.2d 210, 23 O.O.3d 224, 431 N.E.2d 652. In that case, the Ohio Supreme Court considered the standard that required railroads to provide extra statutory precautions when a crossing is particularly dangerous but held:

"[A] general rule of ordinary care in which all circumstances can be considered when determining the standard of care is more appropriate. Therefore, we hold that a railroad has a duty of ordinary care to protect the safety of motorists."

The court further stated that "[t]his conclusion modifies prior case law which required extra-statutory warnings only when a crossing was particularly hazardous." *Id.* at 215, 23 O.O.3d at 227, 431 N.E.2d at 656. By footnote, the court named the cases so modified: *Capelle v. Baltimore & Ohio Rd. Co.* (1940), 136 Ohio St. 203, 16 O.O. 215, 24 N.E.2d 822, and *Canterbury v. Pennsylvania Rd. Co.* (1952), 158 Ohio St. 68, 48 O.O. 34, 107 N.E.2d 115.

Appellant argues that the *Hood* decision was not overruled by *Matkovich* and that railroads are still under a duty to provide warnings beyond those required by statute only when a crossing is particularly hazardous. Appellant contends that the *Hood* case was not specifically mentioned by the *Matkovich* court's footnote because it dealt with facts distinguishable from those presented in *Matkovich.* In *Hood,* the plaintiff was injured by a moving train. In *Matkovich, Canterbury,* and *Capelle,* the plaintiffs were injured when their vehicles struck a train stopped in the railroad crossing. Appellant therefore argues that these three cases establish a "standing train doctrine," which is inapplicable to the present facts.

Appellant's argument ignores the effect of the recent Supreme Court decision in *Carpenter v. Consol. Rail Corp.* (1994), 69 Ohio St.3d 259, 631 N.E.2d 607, in which the court reaffirmed the *Matkovich* standard and applied the standard of ordinary care to situations involving both stationary and moving trains. The court held:

"Under Ohio common law, railroads have a duty to use ordinary care to protect motorists from and warn them of trains *occupying or approaching* a highway crossing. *Matkovich v. Penn Cent. Transp. Co.* (1982), 69 Ohio St.2d 210, 23 O.O.3d 224, 431 N.E.2d 652. A railroad's minimum statutory duty is to erect crossbuck signs at each crossing pursuant to R.C. 4955.33, and this duty may be enlarged under the common law to include additional warnings given special

circumstances. *Id.* at 214–215, 23 O.O.3d at 226–227, 431 N.E.2d at 655–656." (Emphasis added.) 69 Ohio St.3d at 263, 631 N.E.2d at 611.

■ It is this standard that the Union County Court of Common Pleas used when instructing the jury in the cases *sub judice.* Appellant contends that the court's reliance upon *Carpenter* was improper, since the case was decided four days after the collision at the Converse Road crossing. Because appellant contends that *Carpenter* was not the law at the time of the accident, it argues that the court erred when it refused to instruct the jury regarding the standard of care articulated in *Hood.* We find appellant's argument to be without merit.

■ In *Peerless Elec. Co. v. Bowers* (1955), 164 Ohio St. 209, 210, 57 O.O. 411, 411, 129 N.E.2d 467, 468, the Ohio Supreme Court stated that "a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation, and the effect is not that the former was bad law, but that it never was the law." See, also, *Deskins v. Young* (1986), 26 Ohio St.3d 8, 10–11, 26 OBR 7, 8–9, 496 N.E.2d 897, 898–899; *Zagorski v. S. Euclid–Lyndhurst Bd. of Edn.* (1984), 15 Ohio St.3d 10, 12, 15 OBR 8, 10, 471 N.E.2d 1378, 1379–1380.

Therefore, because the *Carpenter* decision had retrospective application, the trial court properly instructed the jury regarding the ordinary care standard articulated in its holding. Appellant's third assignment of error is overruled.

## IV

### Punitive Damages

Appellant's fourth and fifth assignments of error concern the jury award of punitive damages to plaintiffs Ada Garrett and Thomas and Cynthia Gollihue. Conrail first argues that the trial court improperly allowed the issue of punitive damages to go the jury with an instruction based upon the standard of care articulated in *Carpenter v. Consol. Rail Corp.* (1994), 69 Ohio St.3d 259, 631 N.E.2d 607. Appellant restates its argument that *Carpenter* was not the law at the time of the accident and therefore should not be controlling in the present case. Having found this argument to be without merit in our discussion of assignment of error number three, we decline to revisit the issue.

Further, appellant argues that even if the *Carpenter* standard was applicable, the court erred when it submitted the issue of punitive damages to the jury because the evidence presented at trial did not establish that Conrail consciously disregarded the safety of motorists.

■ In *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828, 832, the Ohio Supreme Court held that a trial court should not

instruct the jury on an issue where the evidence is not sufficient to support the instruction:

"It is well established that the trial court will not instruct the jury where there is no evidence to support an issue. *Riley v. Cincinnati* (1976), 46 Ohio St.2d 287, 75 O.O.2d 331, 348 N.E.2d 135. However, the corollary of this maxim is also true. [Footnote omitted.] 'Ordinarily requested instructions should be given if they are correct statements of the law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the instruction.' Markus & Palmer, Trial Handbook for Ohio Lawyers (3 Ed.1991) 860, Section 36:2. See, also, *Feterle v. Huettner* (1971), 28 Ohio St.2d 54, 57 O.O.2d 213, 275 N.E.2d 340, at the syllabus: 'In reviewing a record to ascertain the presence of sufficient evidence to support the giving of a[n] * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.' "

Thus, we must determine whether the record contains sufficient evidence from which reasonable minds might reach the conclusion that punitive damages should be assessed against Conrail on plaintiffs' negligence claims.

The recovery of punitive damages in tort actions is governed by R.C. 2315.21. The statute provides:

"(B) Subject to division (D) of this section, punitive or exemplary damages are not recoverable from a defendant in question in a tort action unless both of the following apply:

"(1) The actions or omissions of that defendant demonstrate malice, aggravated or egregious fraud, oppression, or insult, or that defendant as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate;

"(2) The plaintiff in question has adduced proof of actual damages that resulted from actions or omissions as described in division (B)(1) of this section."

 Therefore, punitive damages may be awarded in tort actions in which actual damages have been proven and the actions of the defendant involve malice. R.C. 2315.21; *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. Punitive damages are not awarded for the purpose of compensating the plaintiff, but, rather, are awarded for the purpose of "punishing the tortfeasor and making him a public example so that others may be deterred from similar conduct." *Motorists Mut. Ins. Co. v. Said* (1992), 63 Ohio St.3d 690, 697, 590 N.E.2d 1228, 1234, overruled on other grounds by *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397.

For purposes of proving punitive damages, "actual malice" has been defined as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston,* supra, 32 Ohio St.3d 334, 512 N.E.2d 1174, at syllabus. In this case, plaintiffs offered evidence that Conrail consciously disregarded the safety of motorists who traversed Conrail's railroad crossings. Thus, the trial court had the duty to determine whether plaintiffs presented sufficient evidence from which a reasonable juror might conclude that Conrail consciously disregarded the rights and safety of such motorists.

To find that a defendant acted with conscious disregard for the safety of others, evidence of mere negligence is insufficient. *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 473, 575 N.E.2d 416, 419, citing *Preston,* supra. As the Ohio Supreme Court stated:

"[A]ctual malice requires consciousness of the near certainty (or otherwise stated 'great probability') that substantial harm will be caused by the tortious behavior. Any less callous mental state is insufficient to incur that level of societal outrage necessary to justify an award of punitive damages. Therefore, it is evident that a reckless actor, who only has knowledge of the mere possibility that his or her actions may result in substantial harm, is not behaving maliciously." *Said,* supra, 63 Ohio St.3d at 698, 590 N.E.2d at 1234, citing Prosser & Keaton, Law of Torts (5 Ed.1984) 212–214, Section 34.

Because it is difficult to ascertain a tortfeasor's mental state, a finding of actual malice may be inferred from conduct and surrounding circumstances. See *Joyce–Couch v. DeSilva* (1991), 77 Ohio App.3d 278, 288, 602 N.E.2d 286, 292–293.

Applying the above standards to the present case, we believe that plaintiffs Garrett and Gollihue presented sufficient evidence to allow the issue of punitive damages against Conrail to go the jury. The evidence demonstrated that Conrail neither voluntarily took steps to evaluate the safety of its crossings nor independently upgraded its hazardous crossings without an order from the PUCO. Thus, the plaintiffs provided evidence that, if believed, would justify a finding that Conrail acted with a conscious disregard of the rights of motorists and that there was a great probability that such disregard would result in harm to the plaintiffs.

Having found that the issue of punitive damages was properly submitted to the jury, we now must consider the propriety of the punitive damages award to each of the plaintiffs.

The jury returned a verdict awarding Thomas and Cynthia Gollihue compensatory damages of $1,500,000 and punitive damages of $2,000,000. Ada Garret was awarded compensatory damages in the amount of $2,007,000 on her wrongful

death claim and punitive damages of $6,000,000 on her claim of property damage. Conrail then filed posttrial motions for judgment notwithstanding the verdicts and for a remittitur. By judgment entry, the trial court denied Conrail's motions for each of the plaintiffs. On appeal, Conrail has alleged several errors in the court's decision to deny its posttrial motions.

Conrail argues that the $6,000,000 punitive damage award for Ada Garrett's property damage claim is grossly excessive, disproportionate to the amount of actual damages, and in violation of common law and the Due Process Clause of the United States Constitution. Therefore, Conrail contends, the trial court erred when it refused to order a remittitur.

In *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 543 N.E.2d 464, the Ohio Supreme Court held, "A jury verdict as to punitive damages which is not the result of (1) passion and prejudice or (2) prejudicial error will not be reduced on appeal." The court further stated that the trial court is in the best position to determine whether an award for punitive damages is so excessive it supports a conclusion that the jury was wrongfully influenced. *Id.* at 40, 543 N.E.2d at 469. Based upon this standard, it is clear that an award of punitive damages is within the discretion of the finder of fact. The award will not be overturned unless it bears no rational relationship or is grossly disproportionate to the award of compensatory damages. *Shore, Shirley & Co. v. Kelley* (1988), 40 Ohio App.3d 10, 16, 531 N.E.2d 333, 339–340; *Alessio v. Hamilton Auto Body, Inc.* (1985), 21 Ohio App.3d 247, 248, 21 OBR 264, 264–265, 486 N.E.2d 1224, 1224–1225.

Conrail claims that the punitive damage award of $6,000,000 to Ada Garrett was disproportionate to the compensatory damage award of $2,007,000. A large disparity between compensatory damages and punitive damages, standing alone, is insufficient to justify a court's interference with the province of the jury. *Villella,* 45 Ohio St.3d at 40, 543 N.E.2d at 469. While there is no rigid mathematical standard to determine proportionality, awards of punitive damages must not be so disproportionate to the actual damages as to indicate they are the result of passion and prejudice rather than reason on the part of the jury. *Gray v. Allison Div., Gen. Motors Corp.* (1977), 52 Ohio App.2d 348, 358–359, 6 O.O.3d 396, 402–403, 370 N.E.2d 747, 754–755.

The purpose of punitive damages is not to compensate the plaintiff, but to punish and deter certain conduct. *Moskovitz v. Mt. Sinai Med.Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331. While the goal is punishment and deterrence, punitive damages should not be used "to vanquish or annihilate the defendant." *Villella,* 45 Ohio St.3d at 43, 543 N.E.2d at 472. Accordingly, the amount of the

punitive damage award should be neither more nor less than is sufficient to achieve the goals of deterrence and punishment. *Id.* at 50, 543 N.E.2d at 477.

 In comparing the amount of punitive damages to the income of defendant, we note that the award of punitive damages to the estate of Bernard Garrett represented one week's net profit for Conrail. Keeping this purpose of punitive damages in mind, we cannot say that a punishment in the form of approximately two percent of Conrail's annual net profit is disproportionate as a punitive measure. Further, we do not find that such an award is so excessive as to result from passion or prejudice.

 When analyzing whether an award of punitive damages is excessive, the court should review not only the purpose of punitive damages and the proportionality between the award and the actual damages suffered, but also must consider 'whether there is a reasonable relationship between the punitive damages award and the harm *likely to result* from the defendant's conduct." (Emphasis added.) *Pacific Mut. Life Ins. Co. v. Haslip* (1991), 499 U.S. 1, 21, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1, 21–22. Therefore, it is important not only to consider the actual harm caused but also the potential harm likely to be caused by defendant's conduct. In the present case there is a potential for harm in the form of severe injuries and fatalities at inadequately protected crossings. Having considered this potential harm, this court is unconvinced that the punitive damages award was excessive.

Therefore, after conducting a careful review of the record, we find that the disparity between the punitive damages and the actual damages in this case is not so disproportionate as to require a reversal of the punitive damage award. Having considered the evidence presented and the actual and potential harm likely to be caused by defendant's conduct, we find that the amount of punitive damages awarded to the estate of Bernard Garrett bears a reasonable relationship to the facts of the case and that there is nothing to show that the jury's award was the product of passion and prejudice.

Conrail also argues that the punitive damages award must be overturned because it was imposed in an arbitrary manner in violation of appellant's procedural due process rights. In support of this argument, appellant cites the Supreme Court cases of *Pacific Mut. Life Ins. Co. v. Haslip* (1991), 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1, and *Honda Motor Co. v. Oberg* (1994), 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336, as delineating the minimum procedural requirements necessary before a court may constitutionally impose punitive damages on a defendant.

In *Pacific Mut. Life,* the Supreme Court examined whether an award of punitive damages violated the Due Process Clause of the Fourteenth Amend-

ment. The court concluded that punitive damages are not *per se* unconstitutional when a jury is properly instructed and adequate posttrial review of the jury award is available. The court in *Honda Motor* noted that judicial review of the punitive damage award is an important safeguard against excessive verdicts. It explained:

"Punitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences. Judicial review of the amount awarded was one of the few procedural safeguards which the common law provided against that danger." 512 U.S. at 432, 114 S.Ct. at 2340–2341, 129 L.Ed.2d at 349.

Because the review procedures in Oregon, the state in which the *Honda* case originated, were inadequate to protect against arbitrary awards, the Supreme Court struck down the award of punitive damages.

While the Supreme Court, in *Honda*, stressed the importance of judicial review, it did not define what standard of review is constitutionally required. *Honda Motor*, 512 U.S. at 432, 114 S.Ct. at 2341, 129 L.Ed.2d at 350, fn. 10. In fact, the court commented that while courts adopt different standards for reviewing awards of punitive damages, "there may not be much practical difference between review that focuses on 'passion and prejudice,' 'gross excessiveness,' or whether the verdict was 'against the great weight of the evidence.'" *Id.*

With these cases in mind, this court must determine whether in the case *sub judice* the procedures and standards for imposing punitive damages satisfy procedural due process. To this end, it is important to examine the jury instructions regarding punitive damages and the court's entry denying defendant's request for a remittitur.

The court instructed the jury as follows:

"The purpose of punitive damages is to punish the offending party, and to make the offending party an example to discourage others from similar conduct. You may decide that the defendant is liable for punitive damages if you find by clear and convincing evidence that the defendant's acts or failures to act demonstrated malice, aggravates [*sic*] or egregious fraud, oppression, or insult.

"Malice includes a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

"Substantial means major, of real importance, of greatest significance, not trifling or small.

"If you award punitive damages, the amounts should be fair and reasonable under all the facts and circumstances. It should not be excessive, nor influenced by passion, sympathy, or prejudice.

"Wanton misconduct must occur under such circumstances that the party doing the act or failing to act must be aware, from his knowledge of such circumstances and conditions, that his conduct will probably result in injury. Wanton misconduct implies a failure to use any care for the safety of others and an indifference to the consequences, when the probability that harm will result from such failure is great, and such probability is know, or ought to be known, to the defendant.* * *

"Then you'll also be asked, on the question of punitive damages in this case [Garrett], did Conrail's conduct reflect wanton or willful misconduct, as I just got done identifying them for you, or a conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm, for which punitive damages may be awarded?"

After a careful review of these instructions as well as the Ohio statutory and common law pertaining to punitive damages, we are unpersuaded by Conrail's claim that the court improperly instructed the jury on this issue. Having found the instruction to be proper, we must next examine whether there has been a meaningful and adequate review of the jury's award of punitive damages.

Conrail argues that since the trial court answered its motions for judgment notwithstanding the verdicts and for a remittitur with a two-sentence entry, appellant's procedural due process rights were violated. In support of this proposition, Conrail again cites the United States Supreme Court case of *Honda Motor* for the proposition that once a jury has returned a verdict on punitive damages, the trial court is required to review that award to make sure it is not disproportionate to the conduct in question and to articulate its findings. This is not an accurate summary of the *Honda Motor* holding.

*Honda Motor* concerned an amendment to the Oregon Constitution which prohibited judicial review of the amount of punitive damages awarded by a jury "unless the court can affirmatively say there is no evidence to support the verdict." The court held that this limitation on judicial review violated the Due Process Clause of the Fourteenth Amendment because it in effect eliminated the power of the Oregon courts to correct excessive punitive damage awards.

In Ohio, the power of the courts to review jury awards of punitive damages has not been restricted. In fact, both trial courts and courts of appeals are free to conduct meaningful posttrial review of such awards. In this case, while the trial court's entry does not reflect the reasons why the court denied Conrail's motions challenging the punitive damages award, there is no evidence that the court failed

to conduct a meaningful review. Furthermore, this court of appeals has reviewed the entire trial record, has examined the arguments from each of the parties, and has concluded that the award of punitive damages was proper in this case. Consequently, appellant's procedural due process rights have been protected.

■ In its final argument, Conrail contends that the trial court improperly permitted the $6,000,000 punitive damage award on Ada Garrett's property damage claim. Conrail argues that a punitive damage award instruction was not warranted because the $100 property damage asserted was minimal and thus insufficient as a matter of law to support the punitive award.

■ R.C. 2125.02 identifies the types of damages recoverable in a wrongful death action. Under this statute, punitive damages are excluded unless there is evidence that the decedent suffered property loss or personal injury before he died. In *Rubeck v. Huffman* (1978), 54 Ohio St.2d 20, 8 O.O.3d 11, 374 N.E.2d 411. The Supreme Court explained:

"Damages in wrongful-death actions are limited to those for 'the pecuniary injury resulting from such death.' That is, they are limited to damages for ' "loss of money, or something by which money or something of money value may be acquired" ' [*Kennedy v. Byers* (1923), 107 Ohio St. 90, 92, 140 N.E. 630, 631] and 'which have been cut off by the premature death of the person from whom they would have proceeded.' *Karr v. Sixt* (1946), 146 Ohio St. 527 [33 O.O. 14, 67 N.E.2d 331], paragraph six of the syllabus. Since punitive damages are 'assessed over and above that amount adequate to compensate an injured party' (*Ranells v. Cleveland* [1975], 41 Ohio St.2d 1, 7 [70 O.O.2d 1, 4, 321 N.E.2d 885, 889] ), they are, by definition, not available in a wrongful-death action." *Id.* at 22–23, 8 O.O.3d at 13, 374 N.E.2d at 413.

In the present case, plaintiff Ada Garrett asserted a claim on behalf of the estate for the destruction of Bernard Garrett's clothing and eyeglasses. This property damage totaled $100. Conrail argues that this amount of property damage is insufficient to support an award of punitive damages. Our court recently addressed this issue in *Sheets v. Norfolk S. Corp.* (1996), 109 Ohio App.3d 278, 671 N.E.2d 1364. In *Sheets,* we explained:

"In addressing the award of punitive damages in an action for wrongful death, it is well established that there is no right to such damages unless it is proven that the decedent has suffered personal injury or property damage resulting from intentional, reckless or willful conduct resulting in death. R.C. 2315.21(B)(2); *Rubeck v. Huffman* (1978), 54 Ohio St.2d 20, 8 O.O.3d 11, 374 N.E.2d 411. In the instant case, plaintiffs submitted evidence demonstrating that decedents Paula Lacy and Tonya Sheets suffered property damage from the destruction of the clothing they were wearing at the time of the collision. In our view, despite the

limited nature of decedents' loss of personal property, the trial court did not err in submitting the issue of punitive damages to the jury. See *Wightman v. Consol. Rail Corp.* (1994), 94 Ohio App.3d 389, 407, 640 N.E.2d 1160, 1172 (finding that R.C. 2315.21 does not require substantial actual damages to support an award of punitive damages)." *Id.* at 287, 671 N.E.2d at 1369.

In the present case, Ada Garrett, as administrator of the Garrett estate, asserted a claim for the decedent's property damage. Regardless of the value of the property lost, the jury was entitled to consider whether punitive damages against Conrail were appropriate. Having found, in *Sheets v. Norfolk Southern,* that the type of property damage sustained by Mr. Garrett was sufficient to support an award of punitive damages, we overrule appellant's final assignment of error.

After a careful review of the record and a consideration of the arguments of the various parties, we have found each of appellant's assignments of error to be without merit. Accordingly, we affirm the judgments of the Union County Court of Common Pleas.

*Judgments affirmed.*

SHAW, J., concurs.

EVANS, P.J., dissents.

EVANS, Presiding Judge, dissenting.

I respectfully dissent from the majority opinion because I find that the trial court erred in admitting evidence of subsequent remedial measures that unfairly influenced and misled the jury into determining that appellant was negligent based upon highly prejudicial and inadmissible evidence.

Furthermore, contrary to the majority's casual dismissal of the issue on the basis of waiver, and despite the appellees' insistence that appellant failed to object to the introduction of the evidence, I find in the record that appellant's attorney did object in open court to admission of the evidence, albeit he did not actually speak the words "I object." As noted by the majority, citing *State v. Grubb* (1986), 28 Ohio St.3d 199, 28 OBR 285, 503 N.E.2d 142, an error is preserved on the record for appellate review by a "ruling on the record when the issue is actually reached and the context is developed at trial." *Id.* at 203, 28 OBR at 289–290, 503 N.E.2d at 146. Thus, the error was preserved, and "called to the court's attention" at the appropriate time, as evidenced by the discussion recorded in the transcript at page 363, and the court's consequent ruling: "I'm going to allow it in." See *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d

98, 364 N.E.2d 1364, paragraph one of the syllabus. Accordingly, I do not find, as did the majority, that appellant waived its right to appeal this error.

In its first assignment of error, appellant contends that the court's admission of evidence of subsequent remedial measures violated the prohibition against such evidence in Evid.R. 407. This rule prohibits the introduction of evidence of subsequent remedial measures to prove negligence or culpable conduct. *McFarland v. Bruno Mach. Corp.* (1994), 68 Ohio St.3d 305, 626 N.E.2d 659, syllabus. As noted by the Ohio Supreme Court, Evid.R. 407 declares this form of relevant evidence inadmissible for certain policy reasons: (1) the subsequent remedial measure is not an admission of negligence, and (2) there is a policy of encouraging remedial measures to prevent further injuries from occurring under the same circumstances. See Staff Notes to Evid.R. 407. Thus, the rule prohibits evidence of subsequent remedial measures where the evidence is introduced to support the allegation of negligence or culpable conduct on the part of the defendant. Such evidence is admissible under the rule *only* when offered to show ownership, control, or feasibility of precautionary measures where these issues are controverted in the case, or for impeachment.

Generally, if a remedial measure was taken by a third party, rather than the actual defendant, the policies against introduction of evidence of the remedial measure are not implicated, and the rule of exclusion may not be not applicable. See, *e.g., Mehojah v. Drummond* (C.A.10, 1995), 56 F.3d 1213; *Brentson v. Chappell* (1990), 66 Ohio App.3d 83, 88, 583 N.E.2d 434, 437; *Schneider v. First Natl. Supermarkets* (Dec. 5, 1996), Cuyahoga App. No. 70226, unreported, 1996 WL 695631; *Keller v. Bacevice* (Nov. 30, 1994), Lorain App. No. 94CA005812, unreported, 1994 WL 666992; *Smith v. Raymond Corp.* (Oct. 25, 1990), Cuyahoga App. No. 57670, unreported, 1990 WL 161996. (Even though such evidence may be relevant, and otherwise admissible, it is still subject to exclusion under Evid.R. 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *White v. Ohio Dept. of Transp.* [1990], 56 Ohio St.3d 39, 46, 564 N.E.2d 462, 468–469.)

However, I believe that the introduction of the evidence of the crossing's selection by PUCO for an upgrade following the accident was unfairly prejudicial to appellant, and that Evid.R. 407 is applicable. In this case it was clear from the evidence on the record that appellant was an active participant, along with PUCO, in determining which crossings were unreasonably hazardous and therefore should have been protected by flashing lights and automatic gates. Because appellant was involved in the selection process, the subsequent measures taken by PUCO could certainly have been understood by the jury as an action by

appellant to upgrade the crossing specifically as a result of appellees' accident. Therefore, given the meager evidence that the crossing at issue was dangerous and the evidence of the truck driver's own negligence in proceeding across the tracks in the path of the train, I find that the evidence of the subsequent remedial measures was unfairly prejudicial, and should therefore have been declared inadmissible by the trial court. "To admit such testimony would tend to distract the mind of the jury from the real issue and create a prejudice against the defendant." *Rohr v. Scioto Valley Traction Co.* (1920), 12 Ohio App. 275, 278.

Moreover, I do not find that appellant opened the door for admission of this unfairly prejudicial evidence by discussing its customary role in selection of crossing upgrades. As stated by appellant, this evidence was elicited for the purpose of demonstrating to the jury that appellant was involved in ongoing evaluation of the safety of its railroad crossings, and in fact, had an actual vote in the PUCO's upgrade process, and not that it had considered and disregarded the condition of the specific crossing at issue. Furthermore, the evidence offered was very general in nature, and was used only to rebut appellees' repeated assertions that appellant does nothing at all to assess the safety of its crossings. This was the very essence of appellant's defense. The trial court's erroneous ruling, to admit highly prejudicial evidence of PUCO's postaccident remedial recommendation and evaluation of the railroad crossing at issue (a decision that was reached, as noted, through cooperation with appellant itself) could have served only to inflame and mislead the jury. Moreover, the court's decision, in effect, denied appellant the right to present its defense, thus denying the railroad a fair trial. Accordingly, I find the introduction of the evidence a flagrant violation of Ohio law regarding the admission of evidence of subsequent remedial measures. For the foregoing reasons, appellant should be granted a new trial.