SCHUMACHER, Appellant,

v.

AMALGAMATED LEASING, INC., Appellee.

[Cite as *Schumacher v. Amalgamated Leasing, Inc.,*
156 Ohio App.3d 393, 2004-Ohio-1203.]

Court of Appeals of Ohio,
Third District, Hancock County.

No. 5–03–29.

Decided March 15, 2004.

Harland M. Britz, for appellant.

David A. Cheney, for appellee.

SHAW, Presiding Judge.

{¶ 1} The plaintiff-appellant, Bruce R. Schumacher, appeals from the August 20, 2003 judgment of the Common Pleas Court of Hancock County, Ohio, dismissing his complaint against the defendant-appellee, Amalgamated Leasing, Inc., d.b.a. Bluffton Flying Service Co. ("BFS"), for failure to state a claim upon which relief could be granted.

{¶ 2} On February 13, 2002, Schumacher filed a complaint in the Hancock County Common Pleas Court. In his complaint, Schumacher alleged that he was terminated from BFS because he reported that BFS's director of operations had consumed alcohol and piloted chartered airplanes with a prohibited concentration of alcohol in his body on several occasions, including September 12, 2001.[1] The complaint set forth two causes of action. The first claim alleged that BFS terminated him in violation of R.C. 4113.52, the Ohio whistleblower statute, and the second count alleged a common-law claim for wrongful termination in violation of public policy, i.e., reporting safety violations in the workplace.

{¶ 3} BFS filed its answer to the complaint on March 25, 2002. In its answer, BFS alleged that Schumacher failed to state a claim upon which relief could be granted. On June 26, 2002, BFS filed an amended answer to the complaint. Once again, it alleged that Schumacher failed to state a claim upon which relief could be granted. In addition, BFS alleged that the trial court lacked jurisdiction because federal law regarding the aviation industry pre-empted his state-law

---

1. The complaint specifically alleged that Schumacher flew with the director on September 11, 2001, when they were grounded out of state due to the events of that day. Schumacher alleged that he witnessed the director consume 20 beers that night and that he was still intoxicated the following day when he piloted a plane back to Ohio.

claims. Subsequently, BFS filed a motion to dismiss the complaint pursuant to Civ.R. 12(B)(6), which the trial court granted on August 20, 2003. This appeal followed, and Schumacher now asserts one assignment of error:

"The Court of Common Pleas of Hancock County erred in granting the motion to dismiss filed pursuant to Civil Rule 12(B)(6) by the defendant-appellee. Said error is contained in the decision and order of the court of common pleas dated August 20, 2003, a copy of which is contained in the appendix to this brief."

{¶ 4} The Ohio Supreme Court has held that "[i]n order for a court to dismiss a complaint for failure to state a claim upon which relief can be granted (Civ. R. 12(B)(6)), it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery." *O'Brien v. Univ. Community Tenants Union, Inc.* (1975), 42 Ohio St.2d 242, 71 O.O.2d 223, 327 N.E.2d 753, syllabus. Further, in construing a complaint for purposes of a dismissal motion, a court must, as a matter of law, accept all of the factual allegations in the complaint as true, and in order to grant such a motion, it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recover. Id. In addition, the court has determined that "[a court] must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the non-moving party." *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192, 532 N.E.2d 753.

{¶ 5} More recently, the court has noted that "a plaintiff is not required to prove his or her case at the pleading state. * * * Consequently, as long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the court may not grant a defendant's motion to dismiss." *York v. Ohio State Hwy. Patrol* (1991), 60 Ohio St.3d 143, 144–145, 573 N.E.2d 1063. Since all factual allegations in the complaint are presumed true, only legal issues are presented, and an entry of dismissal on the pleadings is reviewed de novo. *Mitchell,* 40 Ohio St.3d at 192, 532 N.E.2d 753.

■ {¶ 6} The trial court dismissed Schumacher's complaint because it found that his state-law claims were barred by the pre-emption doctrine. However, Schumacher asserts that the trial court erred in its dismissal because his claims were not barred by federal law. Rather, he maintains that federal law providing whistleblower protection in the airline industry does not pre-empt Ohio's laws regarding similar whistleblower protection. Thus, he asserts that his state-law claims were valid and requests that this court determine that his claims are not barred by pre-emption.

{¶ 7} The principle of federal pre-emption of state law arises directly from the Supremacy Clause of the United States Constitution. Under the Supremacy Clause, "the Laws of the United States * * * shall be the supreme Law of the

Land * * *, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Clause 2, Article VI, United States Constitution. Thus, under this constitutional authority, Congress may pre-empt state law. See *Gollihue v. Consol. Rail Corp.* (1997), 120 Ohio App.3d 378, 390, 697 N.E.2d 1109.

{¶ 8} Although Congress does have the power to pre-empt state law, there is a strong presumption against pre-emption. Id. Consideration of pre-emption issues begins with the "assumption that the historic police powers of the States [are] not to be superseded by * * * [a] Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447. Furthermore, the presumption against pre-emption exists if pre-emption would deny an injured party all judicial remedies, especially in the face of congressional silence. *Silkwood v. Kerr–McGee Corp.* (1984), 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443.

{¶ 9} The United States Supreme Court has summarized the various standards for determining whether a federal law pre-empts a state law as follows:

"Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress." (Citations omitted.) *Louisiana Pub. Serv. Comm. v. Fed. Communications Comm.* (1986), 476 U.S. 355, 368–369, 106 S.Ct. 1890, 90 L.Ed.2d 369.

{¶ 10} While the court articulated these various standards, it emphasized that the "critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law." Id., 476 U.S. at 369, 106 S.Ct. 1890, 90 L.Ed.2d 369, citing *Rice,* 331 U.S. at 230, 67 S.Ct. 1146, 91 L.Ed. 1447. Thus, our focus in this appeal is to determine whether Congress intended to pre-empt both state statutory and common-law tort actions that prohibit the termination of employees who report safety violations of their employers in the airline industry.

{¶ 11} To answer this question, we first examine the relevant federal statutory scheme regarding the airline industry. In 1978, Congress enacted the Airline Deregulation Act ("ADA") "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services[.]" Airline Deregulation Act of 1978, Pub.L. No.

95–504, 92 Stat. 1705 (codified in scattered sections of Title 49, U.S. Code). Included in this Act was a pre-emption provision prohibiting states from enacting laws relating to rates, routes, or services of air carriers. Airline Deregulation Act, Pub.L. No. 95–504, Section 105(a)(1), codified at Section 1305(a)(1), Title 49, U.S. Code. While this provision was modified some years later to omit surplus language, the substantive content of it did not change.[2] The pre-emption provision in its current state provides: "Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." Section 41713(b)(1), Title 49, U.S. Code. Further, the United States Supreme Court has noted that this provision serves the ADA's goal of "promot[ing] maximum reliance on competitive market forces" as opposed to state regulation in shaping the airline industry. *Am. Airlines, Inc. v. Wolens* (1995), 513 U.S. 219, 230, 115 S.Ct. 817, 130 L.Ed.2d 715.

{¶ 12} In 2000, Congress, in recognition of, inter alia, a need to reauthorize various programs, enacted the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century. This Act contained an amendment to Chapter 421 of Title 49 of the U.S. Code, creating the Whistleblower Protection Program ("WPP"). This amendment, in relevant part, contained the following protection for employees who provide air safety information:

"No air carrier or contractor or subcontractor of an air carrier may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee) —
"provided, caused to be provided, or is about to provide (with any knowledge of the employer) or cause to be provided to the employer or Federal Government information relating to any violation or alleged violation of any order, regulation, or standard of the Federal Aviation Administration or any other provision of Federal law relating to air carrier safety under this subtitle or any other law of the United States[.]" Section 42121(a)(1), Title 49, U.S. Code.

{¶ 13} However, the WPP did not include a specific provision regarding pre-emption, nor did it refer to the pre-emption provision in the Airline Deregulation Act of 1978. This omission on the part of Congress is the focal point of contention between the parties in the case sub judice.

{¶ 14} Schumacher maintains that terminating an employee for reporting a safety violation is not related to a price, route, or service of an airline carrier.

---

2. Section 1305(a)(1), Title 49, U.S.Code was removed and renumbered Section 41713, Title 49, U.S.Code.

Thus, the pre-emption provision in Section 41713, Title 49, U.S.Code does not preclude his state-law whistleblower claims against BFS. In addition, Schumacher contends that Congress' failure to include a pre-emption provision in the WPP, particularly when it was on notice that various states were already providing similar whistleblower protection, evidences Congress' intent not to make the WPP the exclusive protection for whistleblowers in the airline industry.

{¶ 15} To the contrary, BFS asserts that Congress' intent in enacting the WPP was to provide an exclusive remedy for workers in the airline industry who report safety violations, which would apply consistently throughout the industry rather than providing varying protections from state to state. In addition, BFS contends that Congress did not include another pre-emption provision in the 2000 legislation because it was aware of the pre-emption provision in the ADA when it enacted the WPP. Thus, BFS maintains that Congress did not include yet another such clause because the ADA's provision, which prohibited states from enacting legislation related to the services of an airline carrier, would also apply to the WPP because the protections of the WPP relate to services of airline carriers.

{¶ 16} In short, we are now called upon to determine whether reporting a safety violation in the airline industry and being subjected to retaliation by an employer for so doing is "related to" the "services"[3] of an air carrier such that the ADA's pre-emption provision from 1978, applies to the WPP legislation created in 2000 and pre-empts Ohio's whistleblower protection. After reviewing the relevant law, as well as the legislative history of these two Acts of Congress, we find that Ohio's whistleblower protections are not pre-empted by federal law for the following reasons.

{¶ 17} Our review of this issue begins by addressing the definition of "related to" as used in Section 41713(b)(1), Title 49, U.S.Code. The United States Supreme Court has previously defined these words. *Morales v. Trans World Airlines, Inc.* (1992), 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157. In determining the meaning of this phrase, the court relied upon basic principles of statutory interpretation, particularly that a court is to " 'begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.' " Id., quoting *FMC Corp. v. Holliday* (1990), 498 U.S. 52, 57, 111 S.Ct. 403, 112 L.Ed.2d 356. In applying these principles to the language of the ADA's pre-emption provision, the court found that the "ordinary meaning of these words is a broad one[,]" thus expressing a broad pre-emptive purpose. *Morales*, 504 U.S. at 383, 112 S.Ct.

---

3. Neither party maintains that Schumacher's claims are "related to" the "price" or "route" of an air carrier.

2031, 119 L.Ed.2d 157. As such, the court defined the term to mean "having a *connection with* or *reference to*[.]" Id. Accordingly, the court held that "State enforcement actions having a *connection with* or *reference to* airline 'rates, routes, or services' are pre-empted under 49 U.S.Code § 1305(a)(1)." [4] Id. Thus, in the case sub judice, if Schumacher's state claims have a connection with or reference to the "prices, routes, or services of an airline carrier," pre-emption is mandated by Section 41713, Title 49, U.S.Code, and the trial court's dismissal of his complaint was warranted.

{¶ 18} The next issue to determine, then, is whether Ohio's whistleblower statute and the state's common-law prohibition of terminating employees in violation of public policy under these circumstances relate to a "service" of an airline carrier. Although the United States Supreme Court has not addressed this specific issue, in support of their respective positions, the parties cite two federal circuit opinions on this precise matter. See *Branche v. Airtran Airways, Inc.* (C.A.11, 2003), 342 F.3d 1248 [5]; *Botz v. Omni Air Internatl.* (C.A.8, 2002), 286 F.3d 488. Although both of these cases involved state whistleblower claims arising after the enactment of the WPP, their facts and holdings are quite dissimilar.

{¶ 19} In *Branche,* the Eleventh Circuit Court of Appeals held that Florida's whistleblower statute was not pre-empted by the WPP when an employee was terminated for post hoc reporting of a safety violation because that court found that this did not relate to the services of an air carrier. *Branche,* 342 F.3d at 1264. However, in *Botz,* the Eighth Circuit Court of Appeals held that Minnesota's whistleblower statute was pre-empted by the WPP when a flight attendant alleged that she was terminated for refusing an assignment that she believed constituted a safety violation because it determined that this was related to a carrier's ability to provide its scheduled services. *Botz,* 286 F.3d at 496–497. Given these differing opinions, we, thus, must examine these cases and their respective rationales in order to determine the issue currently before us.

{¶ 20} The *Botz* case involved a flight attendant who refused an assignment to work an Alaska–to–Japan roundtrip flight, asserting that such an assignment violated Federal Aviation Regulations ("FAR") limiting a flight attendant's "duty period" to no longer than 24 hours. Id., 286 F.3d at 490. Thereafter, her

---

**4.** At the time that the *Morales* case arose, the pre-emption provision at issue was codified at Section 1305(a)(1), Title 49, U.S.Code, but has since been changed to section 41713, Title 49, U.S.Code. However, as previously noted, this change in location did not affect the substance of this provision.

**5.** Airtran Airways, Inc. filed a petition for a writ of certiorari to the United States Supreme Court, which was recently denied by the court on February 23, 2004. *AirTran Airways, Inc. v. Branche* (2004), —— U.S. ——, 124 S.Ct. 1422, —— L.Ed.2d ——.

employer, Omni Air International, Inc. ("Omni") informed her "that she had been discharged for insubordination and refusal to accept an assignment." Id. Botz brought suit against Omni in a Minnesota state court, alleging that Omni terminated her in violation of Minnesota's whistleblower statute. Id. The case was later removed to federal court on the basis of diversity jurisdiction and subsequently dismissed because the federal district court determined that Botz's claims were pre-empted by federal law. Id., 286 F.3d at 489–490. On appeal to the Eighth Circuit, that court affirmed the dismissal on pre-emption grounds.

{¶ 21} The sections of the Minnesota whistleblower statute at issue in *Botz* prohibited employers from terminating employees who (1) reported a violation or suspected violation of federal or state law or rule to an employer, governmental body, or law enforcement official in good faith or (2) refused " 'an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation * * *, and the employee informs the employer that the order is being refused for that reason[.]' " Id., 286 F.3d at 492, fn. 6, quoting Minn.Stat. Section 181.932, subd. 1(a-c) (2000). The Eighth Circuit determined that, "[w]hen applied to the facts surrounding Botz's discharge, the Minnesota whistleblower statute has a forbidden connection with air carrier services." *Botz*, 286 F.3d at 494. In making this determination, the court found that the statute "include[d] broad authorization to flight attendants to refuse assignments, jeopardizing an air carrier's ability to complete its scheduled flights[,]" because the FAR established a minimum number of flight attendants that must be on board and available to serve passengers and execute safety procedures before a flight was permitted even to be boarded by passengers, let alone depart for takeoff. Id.

{¶ 22} For example, the court noted the potential difficulty in replacing a flight attendant who refused a flight assignment, especially if the attendant did so shortly before the flight's scheduled departure. Id., 286 F.3d at 495. Because the Minnesota statute protected employees who had an objective basis in fact to believe that the employer was violating any state or federal law or regulation, a noncompliant employee could, essentially, ground the flight, thereby disrupting and/or preventing the service for which the airline's customers had paid. Id. Thus, the court found that the "authorization to refuse assignments, and the protections that the whistleblower statute provide[d], [had] a forbidden connection with an air carrier's service under any reasonable interpretation of Congress's use of the word 'service.' " (Citations omitted.) Id. However, in *Botz*, the court further noted that its determination that the Minnesota statute was pre-empted was further bolstered by the enactment of the WPP, which was enacted with Congress' knowledge of the ADA's pre-emption clause and its presumed

awareness that the Supreme Court had determined that this clause had a broad application. Id., 286 F.3d at 497.

{¶ 23} The facts of *Branche* are different from those of *Botz*. In *Branche*, the plaintiff was employed by Airtran Airways, Inc. ("Airtran") as an aircraft inspector at Tampa International Airport ("TIA"). *Branche*, 342 F.3d at 1251. On July 2, 2001, he informed the FAA that Airtran had violated FAA regulations. Id. Branche alleged that Airtran permitted its maintenance manager to oversee his work the preceding month in violation of Section 121.365(c), Title 14, C.F.R. and allowed unqualified individuals to conduct diagnostic engine tests on June 30, 2001, in violation of Section 65.81, Title 14, C.F.R. despite the fact that an authorized employee was present at TIA at the time. Id., 342 F.3d at 1251–1252. After discovering that Branche was the one who notified the FAA of these violations, he was accused of "falsifying his time card and stealing approximately two hours of pay[,]" which Branche denied. Id., 342 F.3d at 1252. Shortly thereafter, he was terminated. Id.

{¶ 24} Branche then filed suit in a Florida state court for retaliatory discharge in violation of Florida's Whistleblower Act. Id. The case was removed to federal court on the basis of diversity jurisdiction, and summary judgment was granted in favor of Airtran on the basis of pre-emption. Id. Branche appealed, and the Eleventh Circuit held that his claim was not pre-empted because it did "not relate to the services of an air carrier within the meaning of § 41713[.]" Id., 342 F.3d at 1261. In so doing, the court defined the term "service" broadly in accordance with the dictates of *Morales*. Id., 342 F.3d at 1257, citing *Morales*, 504 U.S. at 383–384, 112 S.Ct. 2031, 119 L.Ed.2d 157. It construed the definition of service "to encompass aspects of air carrier operations beyond the transportation of passengers—i.e., the trappings and incidents of that transportation like on-board food and beverage services, ticketing, and the like[.]" *Branche*, 342 F.3d at 1258. However, the court further noted that "its definition [was] nonetheless still limited to the *bargained-for* aspects of airline operations over which carriers compete." Id.

{¶ 25} In addition, the court determined that Branche's claim was not pre-empted "because safety is not a basis on which airlines compete for passengers, and as such is not something for which air travelers bargain; it is implicit in every ticket sold by every carrier." Id., 342 F.3d at 1260. Thus, the court concluded that the purpose of the ADA, to "promote maximum reliance on competitive market forces," *Wolens*, 513 U.S. at 230, 115 S.Ct. 817, 130 L.Ed.2d 715, was not served by pre-empting state law employment claims related to safety. *Branche*, 342 F.3d at 1260. Accordingly, the court held that Branche's claim was not pre-empted because it was, essentially, "an employment discrimination claim that [did] not implicate any arena in which airlines compete" and, as

such, did "not relate to the services of an air carrier within the meaning of § 41713[.]" Id., 342 F.3d at 1261.

{¶ 26} The Eleventh Circuit also analyzed and discussed the *Botz* decision, noting the significant difference in facts between the two. Id., 342 F.3d at 1262–1263. As previously noted, *Botz* involved a statute that could have permitted the grounding of an airplane, thereby disrupting service to an airline's passengers. *Botz*, 286 F.3d at 495. However, the facts of *Branche* did not involve the potential disruption of services by an employee, but, rather, a statute that protected an employee who provided post hoc reporting of a safety violation. *Branche*, 342 F.3d at 1262–1263. The court in *Branche* specifically found that a report of a safety violation after the fact would possibly involve an investigation into Airtran's practices at TIA but would not ground the plane, "which presumably has either been mechanically cleared and flown away or grounded for mechanical reasons independent of the subsequent report," like the actions of the employee in *Botz* did. Id., 342 F.3d at 1263. The court further held that the enactment of the WPP and the omission of a specific pre-emption provision were susceptible of more than one interpretation as to Congress' intent. Id.

{¶ 27} We find the facts of the case sub judice more similar to those at issue in *Branche*. Here, Schumacher engaged in post hoc reporting of a possible safety violation, i.e., flying an aircraft while intoxicated. His actions did not disrupt the services of BFS in any manner. To the contrary, the director of operations flew the airplane back to Ohio from Michigan. Only after the service, i.e., flying the plane, was completed did Schumacher report that a safety violation had occurred. In addition, Ohio's whistleblower statute does not permit an employee to refuse to perform an action that he believes to be in violation of federal or state regulations as was the case in *Botz*. See R.C. 4113.52. Rather, Ohio's statute requires an employee to report actual or possible violations of federal or state law to his/her supervisor and/or appropriate government official. R.C. 4113.52(A)(1) through (3). In making this report, R.C. 4113.52(B) protects the employee from retaliation by the employer. Thus, an employee is not permitted to disrupt the services of his/her employer but is merely protected for reporting a violation.

{¶ 28} Furthermore, given the assumption that matters within the traditional police powers of the states, such as the area of employment law, are not to be superseded by federal Acts, Congress' intent to pre-empt state whistleblower statutes must be clear and manifest. *Rice*, 331 U.S. at 230, 67 S.Ct. 1146, 91 L.Ed. 1447; *Fort Halifax Packing Co., Inc. v. Coyne* (1987), 482 U.S. 1, 21, 107 S.Ct. 2211, 96 L.Ed.2d 1. We agree with the court in *Branche* that Congress' omission of a pre-emption provision in the WPP is susceptible of more than one inference. In light of the fact that several cases decided prior to Congress' enactment of the WPP found that various state actions, including employment

actions, were not pre-empted by the ADA,[6] Congress may very well have not intended for the WPP to pre-empt state-law employment actions that do not relate to the service of an airline carrier.

{¶ 29} Absent a clear and manifest purpose on Congress' part that all state whistleblower claims as they relate to the airline industry be superseded by the WPP, we decline to hold that Schumacher's state claims are barred by the doctrine of pre-emption. Although we agree, as did the Eleventh Circuit, that Botz's claims under Minnesota's whistleblower statute, which permitted her to refuse her flight assignment, were related to the services of an airline carrier because of the high possibility of a disruption of services, we find that Schumacher's claims are not. Accordingly, the trial court erred in dismissing Schumacher's complaint, and the assignment of error is sustained.

{¶ 30} For these reasons, the judgment of the Common Pleas Court of Hancock County, Ohio, is reversed, and the cause is remanded for further proceedings in accordance with law.

Judgment reversed
and cause remanded.

THOMAS F. BRYANT and CUPP, JJ., concur.

---

6. See, e.g., *Newman v. Am. Airlines, Inc.* (C.A.9, 1999), 176 F.3d 1128; *Wellons v. Northwest Airlines, Inc.* (C.A.6, 1999), 165 F.3d 493; *Abdu–Brisson v. Delta Airlines, Inc.* (C.A.2, 1997), 128 F.3d 77; *Anderson v. Am. Airlines, Inc.* (C.A.5, 1993), 2 F.3d 590; *Espinosa v. Continental Airlines* (D.N.J.2000), 80 F.Supp.2d 297.